This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
Appellant Huntington National Bank ("Huntington") has appealed from an order of the Summit County Court of Common Pleas granting summary judgment in favor of Appellee Key Bank National Association ("Key"). This Court reverses and remands for proceedings consistent with this opinion.
 I
Azzip, Inc. ("Azzip") owned and operated pizza stores through a franchise from Marcos, Inc. ("Marcos"). Key provided financing to Azzip to open and equip its first three stores, in return for which Azzip executed and delivered to Key a series of promissory notes from 1995 through 1997. Key thereafter became concerned about Azzip's financial condition, and refused to extend additional credit to Azzip. Azzip then turned to Huntington for financing to open and equip four more stores, which we will refer to as the Cuyahoga Falls, Wadsworth, Akron-Arlington, and Akron-Ellet stores. Huntington provided Azzip with the credit it needed, and in return Azzip executed and delivered to Huntington a series of promissory notes in 1997 and 1998.
During the time that Huntington was extending credit and Key was refusing to provide additional financing to Azzip, an employee at Key was permitting Azzip to overdraft its checking account without Key's authority. By the summer of 1998, these overdrafts had reached a total of $162,492.63. Disputes then arose between Azzip and Key regarding the loans and the overdrafts. In March 1999, Key and Azzip entered into a "workout agreement" to cover the overdrafts and resolve the loan disputes. Pursuant to the workout agreement, Key loaned Azzip the amount of the overdrafts, $162,492.63, plus an additional $261,879. An internal Key document generated during the preparation of the workout agreement made reference to Key's determination that "Huntington National Bank has three PMSA [purchase money security agreements] on three [l]ocations."
Azzip's financial condition continued to deteriorate, and it ceased doing business and had defaulted on its obligations to both Key and Huntington by September 1999. Key obtained a judgment against Azzip in the amount of $462,901.71, and shortly thereafter Huntington obtained a judgment against Azzip in the amount of $288,766.14. Pursuant to an agreement between Key and Huntington, all of Azzip's assets and equipment were sold to Marcos and the $275,000 proceeds placed in escrow pending resolution of each party's claims.
Key filed a complaint for declaratory judgment, seeking a determination that its claims to all of the $275,000 proceeds were superior to Huntington's interests. Huntington filed an answer and counterclaim, maintaining that it had priority as to $165,080 of the amount in escrow as proceeds from the sale of certain of Azzip's equipment in which it had purchase money security interests. Key and Huntington entered into numerous stipulations of fact, and each party submitted a motion for summary judgment. The trial court denied Huntington's motion and granted summary judgment in favor of Key. Huntington has timely appealed, asserting five assignments of error. This Court has rearranged Huntington's assignments to facilitate review.
 II
Pursuant to Civ.R. 56(C), summary judgment is proper if:
 (1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party.
Temple v. Wean United, Inc. (1977), 50 Ohio St.2d 317, 327. Appellate review of a lower court's entry of summary judgment is de novo, applying the same standard used by the trial court. McKay v. Cutlip (1992),80 Ohio App.3d 487, 491. The party seeking summary judgment initially bears the burden of informing the trial court of the basis for the motion and identifying portions of the record demonstrating an absence of genuine issues of material fact as to the essential elements of the nonmoving party's claims. Dresher v. Burt (1996), 75 Ohio St.3d 280,293. The movant must point to some evidence in the record of the type listed in Civ.R. 56(C) in support of his motion. Id. Once this burden is satisfied, the nonmoving party has the burden, as set forth in Civ.R. 56(E), to offer specific facts showing a genuine issue for trial. Id. The nonmoving party may not rest upon the mere allegations and denials in the pleadings but instead must point to or submit some evidentiary material that shows a genuine dispute over the material facts exists.Henkle v. Henkle (1991), 75 Ohio App.3d 732, 735.
Pursuant to the parties' detailed stipulations of fact, there is no dispute that various promissory notes, security agreements, and financing statements were executed and filed so as to perfect each party's security interests. The only issue before this Court, therefore, is the priority of each party's claims in the $275,000 proceeds from the liquidation of Azzip's assets.
R.C. 1309.31 establishes priorities among conflicting security interests in the same collateral.[1] It is uncontroverted that Key was the first to perfect its security interests, and Key has argued that its claims are superior on that basis. Key's claim to priority is based on R.C. 1309.31(E) and (F), which provide:
 (E) In all cases not governed by other rules stated in this section, including cases of purchase money security interests which do not qualify for the special priorities set forth in divisions (C) and (D) of this section, priority between conflicting security interests in the same collateral shall be determined according to the following rules:
 (1) Conflicting security interests rank according to priority in time of filing or perfection. Priority dates from the time a filing is first made covering the collateral or the time the security interest is first perfected, whichever is earlier, provided that there is no period thereafter when there is neither filing nor perfection.
* * *
 (F) For the purpose of division (E) of this section, a date of filing or perfection as to collateral is also a date of filing or perfection as to proceeds.
Huntington has not disputed that Key was the first to file its financing statements and, therefore, the first to perfect its interests in Azzip's assets. However, Huntington has claimed that it held valid purchase money security interests ("PMSIs") in certain of Azzip's equipment, and that Marcos paid a total of $165,080 for Azzip's equipment subject to its PMSIs. Huntington therefore has claimed a superior interest in $165,080 of the $275,000 in escrow pursuant to R.C. 1309.31(D), which provides:
 (D) A purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral or its proceeds if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within twenty days thereafter.
Accordingly, this Court must determine whether Huntington's security interests were PMSIs and, if so, whether they qualify for the "super-priority" over Key's conflicting security interests pursuant to R.C. 1309.31(D).
 Assignment of Error Number Two The trial court erred as a matter of law by ruling that a purchase money security agreement must contain a specific list of the collateral covered by the purchase money security interest.
In its second assignment of error, Huntington has argued that the trial court erred in holding that a purchase money security agreement must specify with particularity the collateral subject to the PMSI. Specifically, Huntington has maintained that references to Azzip's "equipment" as subject to Huntington's security interests sufficiently describe the subject collateral under Ohio law.
R.C. 1309.08 provides the only statutory guidance on the sufficiency of descriptions in security agreements:
 For the purposes of [R.C. 1309.01 to 1309.50], inclusive, any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described.
It is axiomatic that any determination as to whether a given description "reasonably identifies" particular property must be made in the context of the purpose of the description.[2]
A security agreement is "an agreement which creates or provides for a security interest." R.C. 1309.01(A)(12). Key has not challenged the validity of Huntington's security interests; in fact, Key has stipulated to the attachment and perfection of Huntington's interests. Key has argued, rather, that Huntington's security interests are not purchasemoney security interests, and that Key's interests therefore have priority over those of Huntington. Key's challenge to the sufficiency of the descriptions of collateral in Huntington's security agreements, therefore, depends entirely on Key's argument that the attachment or perfection of a PMSI requires a more specific description of the collateral it secures than is required for a non-purchase money security interest.
Key has failed to demonstrate, however, that such an assertion has any basis in law or in fact. R.C. 1309.01 et seq. does not distinguish a PMSI from a non-purchase money security interest in terms of a more illustrative description of collateral in the security agreement. Instead, R.C. 1309.05 provides the conditions under which a given security interest is a purchase money security interest:
 A security interest is a "purchase money security interest" to the extent that it is:
 (A) taken or retained by the seller of the collateral to secure all of [or] part of its price; or
 (B) taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used.
Not only is a more specific description of the collateral it secures not part of the statutory definition of a PMSI, but, as Huntington has argued, a more specific description is legally inconsequential to the establishment of a PMSI. That is, whether or not a security agreement specifically itemizes every piece of collateral subject to a security interest, the security interest is not a PMSI unless and until the party claiming the PMSI establishes that the conditions of R.C. 1309.05 are satisfied. A detailed itemization of the collateral in the security agreement neither satisfies nor relieves the creditor of his R.C. 1309.05
burden. Huntington's second assignment of error is sustained.
 Assignment of Error Number Three The trial court erred as a matter of law by ruling that a financing statement relating to a purchase money security interest must contain a specific list of the property covered by the purchase money security interest.
In its third assignment of error, Huntington has argued that the trial court erred in concluding that the descriptions of the collateral in its financing statements were not sufficiently specific to perfect PMSIs. Specifically, Huntington has argued that its description of the collateral as Azzip's "equipment" in the financing statements was adequately specific to perfect its PMSIs.
R.C. 1309.39(A) provides the formal requisites for financing statements:
 A financing statement shall state the names of the debtor and the secured party, be signed by the debtor, give an address of the secured party from which information concerning the security interest may be obtained, give a mailing address of the debtor, and include a statement indicating the types, or describing the items, of collateral.
Goods that are collateralized are defined as "equipment" if:
 [T]hey are used or bought for use primarily in business, including farming or a profession, or by a debtor who is a non-profit organization or a governmental subdivision or agency or if the goods are not included in the definitions of inventory, farm products, or consumer goods.
R.C. 1309.07(B).
It is undisputed that the goods formerly owned by Azzip in which Huntington claims PMSIs are "equipment," and that the financing statements filed by Huntington describe its collateral as "equipment." Key has again taken the position, however, that in order for Huntington's undeniably valid security interests to be purchase money security interests, the financing statements providing notice thereof must include a greater degree of specificity when describing the collateral. This Court again rejects Key's reasoning.
The trial court cited a decision of the Second District Court of Appeals that drew upon judicial interpretations of the Uniform Commercial Code from numerous jurisdictions in considering the sufficiency of the descriptions of collateral contained in financing statements. See FarmCredit Serv. of Mid-America, ACA v. Rudy, Inc. (1996), 113 Ohio App.3d 93.Farm Credit quoted extensively from First Bank v. Eastern Livestock Co. (S.D.Miss. 1993), 837 F. Supp. 792, including the following:
 By far, the majority of courts addressing the adequacy of financing statements under the U.C.C. have held that a financing statement, in order to perfect a security interest, need not specifically identify the property which is the subject of a security interest; rather, it is sufficient if the description would put a reasonably prudent prospective lender or buyer on notice that the collateral sought to be purchased or encumbered might be the subject of a preexisting security interest. * * * And, `[s]ince the financing statement is designed only to provide general notice or warning that certain collateral might already be encumbered,' the financing statement `need not provide interested parties with all of the information he needs to understand the secured transaction, but only with the information that such a transaction has taken place and that the particulars thereof may be obtained from the named secured party at the address shown.'
(Citations omitted.) Farm Credit, 113 Ohio App.3d at 99-100, quotingFirst Bank, 837 F. Supp. at 799-800. Nevertheless, the trial court determined that the descriptions of Azzip's equipment in Huntington's financing statements were insufficient to support Huntington's asserted PMSIs.
The survey of judicial interpretations in Farm Credit regarding the specificity requirements in U.C.C. financing statements is consistent with the requirement of R.C. 1309.39(A), quoted in full supra, that the financing statement "give an address of the secured party from which information concerning the security interest may be obtained[.]" It is uncontroverted that Key reviewed the pertinent financing statements filed by Huntington, but never contacted Huntington to further inquire as to the status of Huntington's security interests in Azzip's equipment. Key's claim that it was entitled to rely only "on a review of the public records of [Huntington's] security interest[s]" in agreeing to extend additional credit to Azzip is contrary to the "notice to inquire further" function of financing statements as expressed in U.C.C. commentary, case law, and R.C. 1309.39. Huntington's third assignment of error is sustained.
 Assignment of Error Number Four The trial court erred by ruling that a purchase money security interest cannot, as a matter of law, exist if the security agreement covers property that is not subject to the purchase security money [sic] interest.
In its fourth assignment of error, Huntington has argued that the trial court erred in holding that Huntington's security interests could not, as a matter of law, be purchase money security interests because Huntington's security agreements also gave Huntington non-purchase money security interests in collateral other than equipment. Huntington has argued that such cross-collateralization in the security agreements does not preclude the purchase money status of its security interests in Azzip's equipment.
The security agreements executed and delivered by Azzip to Huntington included as collateral for Huntington's security interests such items as Azzip's inventory, chattel paper, equipment, and general intangibles. Huntington has consistently maintained that its security interests in Azzip's collateral were purchase money security interests only as to theequipment for which it extended financing to Azzip. Huntington has conceded that its security interests in the remainder of the collateral named in the security agreements are only "blanket" security interests, which were perfected after Key's interests and are therefore subordinate to Key's claims pursuant to R.C. 1309.31(E).
The trial court determined that the "transformation rule" applied to eliminate the purchase money nature of Huntington's security interests in Azzip's equipment, and to render all of Huntington's security interests in Azzip's collateral blanket security interests that were inferior to Key's rights in the collateral. Throughout these proceedings, both parties have expended significant energies arguing whether the transformation rule was ever adopted in Ohio.[3] This Court concludes that, whether or not the transformation rule ever wielded influence in Ohio, its underlying policies are inapplicable to the facts of the instant case.
The transformation rule originated in the consumer bankruptcy case ofIn re Manuel (5th Cir. 1975), 507 F.2d 990. Manuel involved a consumer who purchased several items of household furniture on credit from a vendor. Approximately one year later, the consumer purchased a television set from the same vendor, at which time the parties entered into a purchase money security agreement which purported to extend to the combined unpaid balances on the television set and the other furniture items. The consumer subsequently filed for bankruptcy protection, and the vendor asserted that a purchase money security interest in the furniture and television set gave it priority over the claims of the trustee in bankruptcy.
The Fifth Circuit Court of Appeals held that a PMSI could only exist, if at all, as to the television set, because that was the only item of collateral to which the vendor retained a security interest solely to secure all or part of its price. The court rejected the vendor's attempt to claim a PMSI in the other furniture items, because the addition of the television set as collateral for the security interest retained in these other items was an impermissible attempt to "make collateral secure debt other than its own price." Manuel, 507 F.2d at 993. Significantly, the court explicitly declined to determine whether the vendor had obtained a valid PMSI in the television set: "We express no view as to whether a valid purchase money security interest was created with respect to the TV set. Nothing we say is to be taken as a holding as to that." Id. at 994.
The transformation rule was first extended to the secured commercial transaction context in Southtrust Bank v. Borg-Warner Acceptance Corp. (11th Cir. 1985), 760 F.2d 1240. In Borg-Warner, the debtor and creditor entered into a security agreement which gave the creditor a security interest in the debtor's inventory owned at the time of execution of the agreement, and any inventory subsequently acquired by the debtor ("after-acquired property"). The agreement also gave the creditor a security interest in the debtor's inventory for any advances of credit extended by the creditor in the future ("future advances").
Relying on the reasoning of Manuel, the Eleventh Circuit Court of Appeals held that the after-acquired property and future advances clauses destroyed the purchase money nature of the creditor's interest in the debtor's inventory. In so holding, the Eleventh Circuit invalidated the asserted PMSI in all of the debtor's inventory, because it determined that it was impossible to ascertain what specific collateral was subject to the PMSI. The collateral could not be "traced" because it consisted of the debtor's inventory, the specific items of which were ever-changing, and nothing in the security agreement or in applicable state law allocated disbursements of or payments made on the creditor's loan to specific items of inventory. Borg-Warner, like Manuel, thus left open the possibility that a PMSI could be established "to the extent" that the elements of UCC 9-107 (codified at R.C. 1309.05, defining a PMSI) could be established; it merely noted that such tracing was impossible on the facts before it.
Accordingly, this Court declines to hold in the name of the "transformation rule" that after-acquired property or future advance clauses in a security agreement per se preclude the purchase money status of all security interests created by such an agreement. We believe the better rule is to give effect to the language at R.C. 1309.05 which defines security interests as purchase money security interest to theextent that the requirements of that section are satisfied. See, e.g.,John Deere Co. v. Production Credit Association (Ct.App.Tenn. 1984),686 S.W.2d 904 (holding that creditor's PMSI was not purged by cross-collateralization language in security agreement to the extent that the creditor can show its loan proceeds actually went toward the purchase of the collateral covered by the financing statement). Consequently, the transformation rule does not operate to categorically extinguish Huntington's PMSI in Azzip's equipment. Huntington's fourth assignment of error is sustained.
 Assignment of Error Number Five The trial court erred as a matter of law by ruling that Key did not have notice of Huntington's security interests because it was misled by the Huntington documents.
In its fifth assignment of error, Huntington has argued that the trial court erred in ruling that Huntington's documents misled Key, resulting in Key's failure to obtain notice of the purchase money status of Huntington's security interests at the time Key extended additional credit to Azzip in March 1999 as part of the "workout agreement." Specifically, Huntington has argued that an internal document generated by Key shows that Key had actual notice of Huntington's PMSIs. Huntington has also contended that its public filings adequately gave Key notice of Huntington's interests, and that Key failed to inquire further as to the nature of Huntington's interests at its own peril.
The trial court noted, and the parties have not disputed, that an internal document prepared by a Key employee at the time the workout agreement was being negotiated acknowledges that "Huntington National Bank has three PMSA on three [l]ocations" with respect to Azzip. Key has contended that PMSAs, or purchase money security agreements, are not the same as PMSIs, and that "knowledge of a PMSA does not constitute notice of a perfected PMSI."[4] In spite of the unambiguous evidence demonstrating Key's awareness of at least three PMSAs between Huntington and Azzip, Key has maintained that it was misled by the public filings of Huntington. Key has claimed that Huntington's promissory notes, security agreements, and financing statements misled Key into believing that Huntington's interests were only blanket security interests perfected subsequent to, and therefore subordinate to, Key's interests in the same collateral.
Even putting aside the evidence of Key's actual knowledge of the status of Huntington's security agreements, this Court concludes that the public filings of Huntington's documents with respect to its interests in collateral held by Azzip were not misleading as a matter of law. Huntington's financing statements were properly filed and were reviewed by Key prior to its extension of additional financing to Azzip. The financing statements served their purpose;[5] Key had notice that Huntington had security interests in certain assets held by Azzip. The burden was then on Key to inquire further if it wanted more specific information about Huntington's security interests, which information was readily available to Key had it contacted Huntington. Key failed to make further inquiry, and therefore accepted the risk that the collateral in which it took a security interest for its extension of additional credit was subject to the superior purchase money security interests of Huntington. Huntington's fifth assignment of error is sustained.
 Assignment of Error Number One The trial court erred as a matter of law by not granting Huntington's [m]otion for [s]ummary [j]udgment in that there exist no genuine issues of any material fact with respect to Huntington's [m]otion for [s]ummary [j]udgment and based upon the undisputed facts, Huntington is entitled as a matter of law to judgment in its favor.
In its first assignment of error, Huntington has argued that the trial court erred in not granting its motion for summary judgment. Huntington has argued that there are no genuine issues of material fact as to its PMSIs, and that Huntington is entitled to judgment as a matter of law on its claim to $165,080 of the proceeds of the sale of Azzip's equipment.
As this Court has already noted, the validity of each party's security interests in the assets formerly owned by Azzip is not at issue. Both Key and Huntington have stipulated to the attachment and perfection of each party's security interests. What is in dispute, however, is whether any of Huntington's security interests in Azzip's equipment were purchase money
security interests. Huntington has a superior claim to any portion of the $275,000 total proceeds from the sale of Azzip's assets in which it can establish that it had PMSIs. As to the proceeds from the sale of any assets in which Huntington fails to establish its PMSIs, however, Key has the superior claim.
 A security interest is a "purchase money security interest" to the extent that it is:
* * *
 (B) taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used.
R.C. 1309.05. Huntington clearly gave value to Azzip "by making advances or incurring an obligation" when it provided Azzip with financing. To establish that it retained PMSIs, however, Huntington must also show that the value given enabled Azzip to acquire rights in or the use of the equipment, and that such value was in fact so used.
To establish these elements, Huntington attached to its motion for summary judgment affidavits of Joseph Boles, Jr. and William Flinta. Boles was the President of Azzip, and testified that Huntington provided loans to Azzip for the purpose of purchasing assets and equipment for the Cuyahoga Falls, Wadsworth, Akron-Arlington, and Akron-Ellet stores. Flinta was an assistant vice president at Huntington, and was the loan officer in charge of the Azzip accounts. Flinta testified that Huntington issued checks for the purpose of purchasing specific equipment and assets for the Azzip stores, and that all of the loans were so used.
Key has argued that the affidavits of Boles and Flinta are extrinsic evidence and, as such, should not be considered in determining whether Huntington retained PMSIs. Key has contended that the security instruments themselves must establish the purchase money nature of Huntington's interests. R.C. 1309.05, however, requires the introduction of extrinsic evidence to prove a PMSI. Regardless of the terms of the security agreement, a secured party claiming a PMSI must demonstrate that it gave value to the debtor to enable it to acquire rights in or the use of the collateral and that the value was so used. R.C. 1309.05(B). The affidavits of Boles and Flinta, as well as the copies of relevant documents evidencing the disbursement of funds from Huntington to Azzip and its vendors, are therefore both relevant and necessary to Huntington's claims.
Key has also argued that Huntington failed to comply with R.C.1309.31(D), which specifies that a PMSI has priority over conflicting security interests in the same collateral if the PMSI is "perfected at the time the debtor receives possession of the collateral or within twenty days thereafter." However, the dates of execution of the notes and security agreements, as well as the dates of filing of the financing statements, establish that Huntington's interests in the assets of each of the four stores were perfected on or before the date that Azzip took delivery of any collateral.[6] Moreover, Boles testified that Azzip did not receive any of the collateral subject to Huntington's interests until after Huntington paid for it. Huntington therefore complied with the requirements of R.C. 1309.31(D).
Key has also argued that Best Restaurant Equipment and Design, Inc. ("Best Restaurant") has a competing security interest, and possibly a PMSI, in certain of the items of equipment in which Huntington claims a PMSI. The rights of Best Restaurant, however, are not before this Court on the instant appeal. Key initiated this suit against Huntington seeking a declaration of the relative rights to proceeds from the sale of collateral as between Huntington and Key. Any security interests of Best Restaurant in the same collateral do not affect the relative rights of Huntington and Key.
Nevertheless, this Court concludes that genuine issues of material fact exist with respect to the purchase money nature of Huntington's security interests. Specifically, the evidence submitted by Huntington is insufficient to conclusively establish that Huntington gave value that enabled Azzip to acquire rights in all the collateral in which Huntington has claimed PMSIs, or that all the value given was so used by Azzip. Huntington has argued, for example, that it retained a PMSI in equipment purchased for the Akron-Ellet store from Best Restaurant. The evidence submitted by Huntington in support of its motion for summary judgment, however, shows that of the funds used to purchase this equipment, $17,248.62 was paid for by a check from Azzip. Huntington has failed to show that it advanced to Azzip this purchase money, and hence has failed to show that it enabled Azzip "to acquire rights in or the use of" the equipment.[7] Accordingly, genuine issues of material fact as to the purchase money nature of Huntington's security interests remain, and Huntington is not entitled to judgment as a matter of law. Huntington's first assignment of error is overruled.
 III
Huntington's second, third, fourth, and fifth assignments of error are sustained; its first assignment of error is overruled. The judgment of the trial court is reversed, and the cause remanded for proceedings consistent with this opinion.
Judgment reversed, and cause remanded.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellee.
Exceptions.
SLABY, P.J. CONCURS, CARR, J., CONCURS IN JUDGMENT ONLY
[1] R.C. 1309.01 et seq. was extensively amended by Am. Sub. S.B. 74, effective July 1, 2001, and, as both parties have noted, the new provisions explicitly resolve some of the questions of law before this Court in the instant appeal. However, R.C. 1309.702(C) specifies that "[t]his chapter does not affect an action, case, or proceeding commenced prior to July 1, 2001." Therefore, as Key's complaint for declaratory judgment was filed on October 3, 2000, this Court applies the provisions of R.C. Chapter 1309 in effect prior to the Am. Sub. S.B. 74 amendments.
[2] In its order granting Key's motion for summary judgment, the trial court at times referred to Huntington's security agreements and financing statements interchangeably as "security instruments." As the legal function of each is different, however, the content of each document necessary to adequately perform its function is also different. Consequently, this Court will separately address Huntington's contentions that the descriptions of the collateral in both the security agreements and financing statements at issue were sufficiently specific.
[3] While it did not become effective until after this litigation had commenced, R.C. 1309.103(F) definitively eradicates the transformation rule in the context of secured transactions.
[4] PSMAs and PMSIs, however, are not so disconnected as Key has suggested. R.C. 1309.01(A)(12) defines a "security agreement" as "an agreement which creates or provides for a security interest." It is difficult to conceive of what sort of security interest a purchase money security agreement would "create or provide for," if not a purchase money security interest.
[5] See discussion of Huntington's third assignment of error,supra.
[6] Key has argued that Huntington cannot rely on financing statements filed before the loans were made to secure PMSIs in Azzip's assets. However, "[a] financing statement may be filed before a security agreement is made or a security interest otherwise attaches." R.C.1309.39(A). In such a case, perfection of the security interest dates from the time when it attaches. R.C. 1309.22(A).
[7] This failure of proof is avoided in those cases where records show that Huntington disbursed the funds directly to the vendors of the collateral.